*1271-15*

ORIGINAL

Cause No. 13-14-00609 CR
In the Court of Appeals

Brief for Appellant

Orlando Robles
Appellant
v.
State of Texas
Appellee

On Appeal from
The 28th District Court of Nueces County, Tx.

RECEIVED IN
COURT OF CRIMINAL APPEALS

DEC 04 2015

Abel Acosta, Clerk

Oral Argument not requested.
No Motion filed for Rehearing

FILED IN
COURT OF CRIMINAL APPEALS

DEC 04 2015

Abel Acosta, Clerk

# Table of Cited Authorities
## Cases

Cortina v. State, unpub., No. 06-13-00084-CR (Sixth Court of Appeals, Texarkana December 11, 2013)

Dunn v. United States, 307 F. 2d at 886

Gaytan v. State, 331 S.W. 3d. 218 (Tex. App.-Austin 2011)

Gigliobianco v. State, 210 S.W. 3d 637 (Tex. Crim. App. 2006)

Holte v. State, unpub., (no. 01-12-00338-CR First Court of Appeals, 12/01/2013

Johnston v. State, 145 S.W. 3d 215 (Tex. Crim. App. 2004)

Montgomery v. State, 810 S.W. 2d 372, (Tex. Crim. App. 1990)

Ocon v. State, 284 S.W. 3d 880, 884 (Tex. Crim. App. 2009)

Santellan v. State, 939 S.W. 2d. 155 (Tex. Crim. App. 1997)

State v. Lee, 15 S.W. 3d 921, 923 (Tex. Crim. App. 2000)

Wood v. State, 18 S.W. 3d. 642, 650 (Tex. Crim. App. 2000)

## Statement of the case

To The Honorable Court of Appeals

Now comes, Orlando Robles, appellant, and submits this brief urging error related to his conviction. This appeal stems from a conviction for Sexual Assault, a violation of the Texas Penal Code 22.011. Appellant was sentenced to twenty (20) years incarceration in the Texas Department of Criminal Justice

Prior to Voir Dire, defense counsel and the prosecutor approached the bench to discuss certain matters. The defense requested hard copies of the Defendant's medical records which the state intended to produce. The court ordered the State to turn over hard copies to the Defense by the end of the day. Further, the defense requested that the State not make mention of a "Codis" registry, as it could indicate to the jury that there were other victims. (RR, vol 2, pg. 8-10, ln. 17-25; 1-25; 1-9) The defense then sought to limit the State's discussion of DNA sampling as it related to any persons who were not the victim in the present case (namely: Mrs. Alaniz) The state agreed, and the Motion in Limine was granted. (RR, vol 2, pg. 10-11, ln. 10-25; 1-2) The defense the sought to limit the State's

ability, to refer to a website called, "Moco Space". It was described to the court as, "server that used to solicit illegal drug sales, prostitution, stolen merchandise and maybe even some minor legitimate things. (RR, Vol. 2, pg. 11-12, In 17-25; 1-11). The defense the sought to limit the offering of evidence of blood found in a prior search of defendant's car. The State agreed, and the Court Ordered any such evidence should be discussed outside of the presence of the jury before being admitted. (RR, vol 2, pg 12-13, In. 12-25; 1-11) Finally, the defense sought to limit the State's witnesses to testimony about the victim in the current case only. The state agreed to approach should the issue come up, and the Court agreed, and ordered any such evidence to be ruled on outside of the presence of the jury. (RR, vol. 2, pg. 13-14, In. 12-25; 1-3)

The State the stated that the defense had a past relationship with the victim due to a case wherein he represented another defendant charged with molesting her when she was 10 years old. The state sought to limit any introduction of any such testimony without a prior ruling from the Court outside of the presence of the jury.

The court agreed. (RR, vol. 2, pg 14-16, ln. 6-25; 1-25; 1-5) The State and Defense agreed to allow DNA testimony in without establishing the chain of custody due to scheduling conflicts on the part of the witness. The defense stated their belief that the evidence would come anyway, and that it was material to their case as well. (RR, vol 2, pg. 16, In. 7-17) The state then requested a jury shuffle, and was granted the same. Voir Dire was conducted without incident

   After the case was called, but prior to the jury being brought in, the defense brought concern to the judge regarding evidence of medical treatment for the alleged victim, and prior convictions of the Defendant that were not provided as per the 9.02(e) request filed by defense counsel. (RR, vol. 3, pg. 4-7, In. 21-25; 1-25; 1-3) The defense affirmed that he would lodge objections to each as they were offered during trial.

   The state began it case by calling Samanth Alaniz. Ms. Alaniz testified that she was 20 years old, and had resided in Corpus Christi her entire life. She testified that on the day in question, at roughly 4 o'clock in the morning, she left home to "put gas"

and soon thereafter, she drove to Cole Park. (RR, vol. 3, pg. 25, ln. 20-24) After a short time, she left the park and headed back down Louisiana Street towards her home. While stopped at the light, she noticed the Defendant walking up next to her driver's side window. According to Ms. Alaniz, the defendant told her she was dragging something. She testified that she pulled over to investigate her vehicle and the Defendant approached her. (RR, vol 3, pg 31-33, ln. 3-25; 1-25; 1-8) She stated that his demeanor was "pretty low key". She stated that at some point, she began to feel uneasy, and held her keys in such a way as to be able to use them as a weapon. Ms. Alaniz said the Defendant three times asked her where her spare tire was, and then attacked her. (R.R., vol 3, pg 36-37, ln. 10-25; 1-25; 1-8) She described the alleged attack, stating, "He slams my head, he's hitting me. He goes to pull my shorts off I say "no" He succeeds, I look to my left, I see my phone". (RR, vol 3, pg. 38, ln. 21-24) She states that he banged her head against the ground causing a "big ol' scab" (RR, vol 3, pg. 39, ln. 20) During the altercation, she stated that she hit or stabbed him with her keys, and demonstrated the same with

the assistance of the prosecutor. Mrs Alaniz stated that once her shorts were removed, that the Defendant stuck his fingers inside of her. She stated that she pressed the panic button on her keys and began to stab him with them. She testified that when the horn sounded for the fourth time, he got off of her. (RR, vol 3, pg 46, ln. 8-9) She then got in her car and drove to the Stripes store located nearby (across the street from the Bel-Air shopping Center on Staples). (RR, vol 3, pg 47, ln 7-18) Once at the store, she honked her horn until the Stripes employee came up to assist her. She stayed in the car because she was not wearing clothes from the waste down. (RR, vol 3, pg. 47-48, ln 20-25; 1-11) Soon there after, the police arrived. She answered their questions, and gave a description of her attacker. Ms. Alaniz testified that her mother drove to pick her fpiend Jade at that point. She stated that the police officer at the scene told her to go home and take a shower. Instead, she went home to smoke pot.

Ms. Alaniz went to the hospital. (RR vol 3, pg. 54-55, ln 1-25; 1-11) Once at Doctor's Regional Hospital, Ms. Alaniz was taken into an examination room where they gave her an exam. She indicated that she was injured/bleeding from her sexual

organ. The exam confirmed the same. (RR, vol 3, pg 60-63, ln. 12-25; 1-25; 1-2; 1-3) she indicated that after her medical treatment, she returned home, took a shower and went to sleep.

The following day, she met with detectives. She was shown line ups on three seperate occasions there after and could not identify the Defendant in any line up provided. The state then passed the witness. On cross examination, Ms. Alaniz confirmed none of the Defendant's DNA was found on the vaginal swabs. (RR, vol 3, pg 77, ln 12-22) She stated that she had smoked marijuana prior to going to the park; and that she had been in the presence of a "male friend". On redirect, the State offered Exhibits 1-37, photographs of the victim. After a brief Voir Dive examination, they were admitted without objection. (RR, vol. 3 pg. 122-127, ln. 21-25; 1-25; 1-14) The photos were published to the jury and the State went through them via television screen one by one with Ms. Alaniz. After a brief recross and redirect, Ms. Alaniz was released from the stand.

The State's next witness was Lisa Baylor. Both counsels approached the bench, where Defense counsel again objected to any mention of CODIS, as was ordered in the limine motion prior to the commencement of trial. Ms. Baylor stated that

she worked as a forensic scientist for Nueces County, and had been in that field for twenty two years. Ms. Baylor outlined how she handles evidence in cases, and described what she did with the victim's panties. (RR, vol.3, pg.157, ln. 8-25) She stated that she found three stained areas, marked A, B and C. A and B areas were identified as blood, and were preserved for DNA testing. Sample C was tested and was found to be negative for semen. It was also preserved and sent for DNA testing. (RR, vol.3, pg.160, ln. 1-7) The DNA in samples A and B were consistent with Ms. Alaniz. Sample C was a mixture of two or more individual's DNA, of which the Defendant's DNA was also found on the victim's keys, and under her finger nails. (RR, vol.3, pg. 169, ln. 10-19; RR, vol.3, pg. 175. ln 8-16) The state then sought to offer Ms. Baylor's report as evidence. Defense counsel objected, stating, "I'll object to the offering of these two exhibits. The witness has testified from these two documents, and she's testified to the contents, she's testified to her analysis and to offer these exhibits is nothing more than duplicitous. And reports are generally not admitted into evidence after a witness testifies and that's my objections."

(RR, vol. 3, pg. 184, ln. 8-14) Exhibit 38 was admitted over the objection of the defense. On cross examination, Ms. Baylor conceded that she could not affirmatively testify as to whether the Defendant's cell were from the inside or outside of the victim's panties. (RR, vol. 3, pg. 200-201, ln. 22-25; 1-5) She also stated that none of the Defendant's DNA was found on the vaginal swabs taken from the victim. (RR, vol. 3, pg. 215, ln. 22-25; 11-25) Finally, Ms Baylor excluded the defendant as the source of any DNA found on the internal panels of the victim's panties. (RR, vol. 3, pg. 217, ln. 22-25; 1-25) She stated that the defendant's DNA could not be excluded from sample C however, which could have been deposited on the outside or waistband of the panties.

The state's next witness was Alyssa Hernandez, who after being sworn in, testified to the following. Ms. Hernandez is a police officer of Corpus Christi Police Department. On the date in questions (September 29, 2013) she was patrolling the area around Staples and Annapolis when she saw the victim waved them down. The victim kept saying "he tried to rape me" (RR, vol. 3 pg. 231-232, ln. 20-25; 1-5)

She stated that her car was equipped with a camera and her uniform was equipped with a microphone. The State then offered States exhibit 39, a video form the night in questions, without objection. Officer Hernandez discussed the victim's demeanor and appearance on the night of the event. She testified that the victim's demeanor and appearance on the night of the event. She testified that the victim's shirt was not covered in blood that day.

Under cross examination, she testified that she did not tell the victim to go home and take a shower. She also stated that the victim' refused treatment or to be transported to the hospital. (RR, vol.3, pg. 248, ln. 17-25) Defense counsel questioned the officer regarding her report, and pointed out that the victim told the officer regarding her report, and pointed out that the victim told the officer that she was going from Cole Park to the gas station. (RR, vol.3, pg. 217, ln. 17-25) However, in her testimony, the victim stated that she got gas prior to going to Cole Park. She also testified that according to her report, the first encounter between the victim and the defendant occurred when, a red pickup pulled up next

to her at Menger Elementary and the driver told her there's something wrong with the back of your car, pointed to the vehicle." (RR, vol. 4, pg. 9, ln. 18-23) Officer Hernandez told the jury that was a crime scene. However, she stated multiple people including the victim had been allowed to enter and exit the vehicle without objection from the police. (RR, vol 4 pg. 12-13 ln. 19-25; 1-24)

The state then called Officer Eric Smith to the stand. Officer Smith testified that in cases such as the present assault, victims are taken to the hospital for a Sane examination. However, because the victim's family was present, he allowed them to take her instead of an ambulance or police car. (RR, vol. 4, pg. 25-26, ln. 21-25; 1-9) he also testified that he did not tell the victim to go home and take a shower. Stating, "no, that's a huge don't, for the Sane Exam, there's several policies and we need them not to take a shower, not to wash, not to change clothes because we need that as evidence." The officer stated that it surprised him that the victim did not go to the hospital until the following morning. (RR, vol. 4, pg. 36,

ln. 1-6)

The state then called Detective Jason Smith to the stand. (RR, vol. 4, pg. 42, ln. 14-15) Detective Smith identified the defendant in the court room as Orlendo Robles. He testified that after meeting the Defendant, he took DNA samples from him (RR, vol 4, pg. 51, ln. 5-25) Under cross examination, he testified that though the victim had been shown two line-ups featuring the defendant, she could not identify him. (RR, vol. 4, pg. 68, ln. 11-18)

The state then called Carol McLaughlen to the stand. She stated her name and identified herself as a forensic nurse at Dr. Regional Hospital. (RR, vol. 4, pg. 82, ln. 18-25) The state provided her with State's Exhibit 52, a rape kit supposedly taken at the hospital. Ms. McLaughlen identified the kit as belonging to an Avery Trevino on September 28, 2013. (RR, vol. 4, pg. 87, ln 1-2) Counsel's approached the bench and determined that the kit offered was for another alleged victim, from another alleged sexual assault. The state conceded that it was the wrong kit. The defense immediately moved for a mistrial, stating, "we had Detective Smith identify that box as coming as evidence in this case, and now

Ms. McLaughlen has read a different name, everybody been careful to pick out-- keep out extraneous.... there were items read off of that box by Detective Smith, he read and testified what was inside of that box." The defense continued his objection by stating, "The State offered evidence to the jury now its extraneous evidence. Its extraneous ~~offense~~, I mean, it doesn't take an Einstein on the jury to figure out, " Well, you got more than one rape kit; you got more than one victim" (RR, vol 4, pg. 87-89, ln. 1-25; 1-18) the judge denied the motion for a mistrial. Defense preserved the objection, stating, "don't think there's any question that there was testimony offered about Ms. Alaniz's test kit, and now Nurse McLaughlen has identified another test kit with another name. The jury knows what that test kit is about and what the purpose of it is, and I don't see how there could be any inference that it is not another case connected with this defendant. Detective Smith identified it by number; he testified that he's the one that took that box over to DPS. The DPS case worker, Ms. Baylor, looked at that box, she identified it, she said what was in that box."

(RR, vol. 4, pg. 91, ln. 1-12) The court again ruled that there was room for a curative measure and denied Defense's motion for a mistrial. Defense again objected, stating, "I will just object and I don't think that your instructions to the jury will cure that problem, so I just want that noted on the record."

The State then called again Detective Smith. The defense objected to the testimony of Detective Smith and to the offer of any new evidence from Detective Smith. (RR, vol 4, pg. 96, ln. 22-25) detective Smith brought another Sane kit box into court, this time identifying it as the victim's kit. The State then recalled Carol McLaughlen to the stand. Nurse McLaughlen identified the newly admitted Sane kit as that of Samantha Alaniz, which was dated 9/29/2013. She testified about 23 seperate injuries to Ms. Alaniz's body. She also described the history provided by the victim. She testified about the abrasion found on the victims sexual organ, and described how such an injury could occur. (RR, vol 4, pg. 106-107, ln. 1-25; 1-7.) Following cross examination, the State offered nurse McLaughlen's report as state's exhibit 54 without objection after

the notes were removed therefrom. The state rested.

The following day, prior to the jury being brought out, the Defense renewed his request for a mistrial, stating, "I want to renew my request for a mistrial on this case. I got calls last night until 10:30 about the fact that my client had two allegations against him. The press has been broadcasting since Tuesday the nature of this trial, yesterday and this morning and in the newspaper also it ecludes to the fact that my client has two charges against him. I think it was unusual that the wrong rape kit or sexual assault kit got identified by Officer Smith or Detective Smith and also got identified by McLaughlen, Nurse McLaughlen, but she actually read the name of another person which she was asked. I don't really blame her, that's what she was asked to do but I think that the inference it's so overwhelming that my client has committed an extraneous offense and that's just a little bit more evidence that a jury will need to resolve the doubt in a favor of the State, if they had even a close doubt, so I want to renew my objection

and to the -- my request for a mistrial."
(RR, vol.5, pg. 4-5, ln.18-25; 1-11) The request
was denied by the Court. After closing
arguments, the jury began deliberations.
The jury returned with a guilty verdict as
to the charge of Sexual Assault. The court
then began the punishment phase of the
trial.

Prior to the entrance of the jury, the
State sought to offer State's Exhibit 55
and 56, which were alleged to be certified
copies of convictions for burglary and
misdemeanor indecent exposure. (RR, vol 5,
pg 4-5, ln. 2-11) The defense objected to the
documents as hearsay, and because they
could not be authenticated as final judgments
Further, exhibit 56 purported to be a felony
conviction for "crimes against nature" of
which there is no equivalent in Texas. Finally,
counsel objected "on the basis that is not 38.28
material, it violates Rule 902 and it violates --
I don't have the specific Rule 602 of the rules
of evidence." (RR, vol 5, pg. 54, ln. 1-25)
The objections were overruled, and the documents
were admitted. The State then called Giana Galvan
who testified that the Defendant had assaulted

her on another occasion, and that she had stabbed him in response. The State and Defense rested. Each side offered closing arguments. The jury returned with a sentence of twenty years imprisonment and no fine.

## Summary of Arguements

Issue 1: The Court's denial of Defense request for a mistrial was in error;

Issue 2: The Court abused its discretion by admitting evidence of the Appellant's prior convictions over defense objections

## Argument And Authority

Issue 1: The Court's denial of Defense's request for a mistrial was in error. The Appellant was charged with Sexual Assault under TPC 22.011, the elements of which are 1) intentionally or knowingly, 2) causes the penetration of the anus or sexual organ of another person by any means, without that person's conscent. (Texas Penal Code, 22.011) Evidence of other elements or crimes outside of those required for conviction is inadmissible. Though the evidence in question, (the existence of a second Sane kit, and therefore a second sexual assault tied to the appellant) was not admitted; it was discussed and presented in open court in the jury presence. As was discussed in Dunn v.

United States, "If you throw a skunk into the jury box, you can't instruct the jury not to smell it." Dunn, 307 F. 2d at 886.

## Due Process and the Right to a Fair Trial

A trial court's ruling on a motion for mistrial is reviewed for an abuse of discretion. Ocon v. State, 284 S.W. 3d 880, 884 (Tex. Crim. App. 2009). The fact that the jury was made aware of a second Sane kit and second victim was a violation of the Due Process Clause of the United States Constitution and the Due Course of Law Clause of the Texas Constitution. Generally, when a defendant is surprised by some event at trial, he should request a continuance to allow time to prepare or to find witnesses to rebut the surprise. Wood v. State, 18 S.W. 3d 642, 650 (Tex. Crim. App. 2000). In the present case, a continuance would not be appropriate because the trial had already begun. Further, since the evidence in question should have never been heard by the jury, the requirement that the Appellant find someone to testify in the contrary is a breach of his Due process rights under both the United States and Texas

State constitutions. The interest of justice required the Appellant to move for mistrial because the prosecutor deliberately or recklessly "crossed" the line between legitimate adversarial gamesmanship and manifestly improper methods"... that rendered trial before the jury unfair to such a degree that no judicial admonishment could have cured it. State v. Lee, 15 S.W. 3d. 921, 923 (Tex. Crim. App. 2000) In the present case, the State had a duty to assure that any Sane kit brought into court and identified in front of the jury was the correct kit, connected to the correct victim. To allow the case to move forward after the Appellant moved for a mistrial was to deny him of the right to confront his accuser (in the second Sane kit) and the right to a fair trial, as the jury became aware of evidence that was barred from admission as per the rules of evidence. Once the jury became aware of the second Sane kit, the only curative measure was to declare a mistrial.

Inadmissible under Texas Rules of Evidence 401:

During the pendency of the guilt or innocense phase of a trial, The Court should only admit evidence that is relevant to the crime charged. Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action moreprobable or less probable than it would be without the evidence. (TEXAS RULES OF EVIDENCE, 401). In deciding whether a particular piece of evidence is relevant, a trial court judge should ask "would a reasoncble person, with some experience in the real world believe that the particular piece of evidence is **help**ful in determining the truth or falsity of any fact that is of consequence of the lawsuit." Montgomery v. State, 810 S.W. 2d 372 (Tex. Crim. App. 1990) In the present case, the existence of a second SANE kit would in no way prove or disprove either element of Sexua Assault. The existence of a second kit could serve only to enrage or prejudice the jury. The fact issues being the elements of the crime, and the plausibility of the defense, the **second** Sane kit has no logical connection.

With no logical connection to any fact issue in the cause of action, the evidence is therefore irrelevent under TRE 401. Evidence which is not relevant is inadmissible. (Texas Rules of Evidence 402)

Inadmissible Under Texas Rules of Evidence 404(b):

Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. (Texas Rules of Evidence 404(b) For extraneous offense evidence to be admissible under both Rule 404(b) and Rule 403, that evidence must satisfy the following two-prong test: 1.) Is the extraneous offense evidence relevant to a fact of consequence in the case apart from its tendency to prove conduct in conformity with character; 2.) Is the probative value of the evidence sufficiently strong so that it is not substantially out weighed by unfair prejudice? Johnston v. State, 145 S.W.3d 215 (Tex. Crim. App 2004) If the opponent involves only Rule 404, then only the first

prong must be satisfied. Santellen v. State, 939 S.W. 2d 155 (Tex. Crim. App. 1997) Further, once the opponent of extraneous-acts evidence raises an appropriate character-evidence objection, the proponent of the evidence must satisfy the trial court that the evidence has relevance apart from proving character conformity. Johnston, **145 S.W. 3d 215.** (Tex. Crim. App. 2004) In the present case, the State's expert testified about what a Sane kit is, and how it relates to both rape, and those connected therewith. That included both the victim and the alleged assaulter. However, when the nurse read from the kit in court, it became clear that it was from a different victim. The jury could therefore assume that the Defendant was connected in some way with another sexual assault Once the evidence was objected to by the Defense, the State conceded that it was inadmissible and should be addressed with a curative measure. The appellant argues that there was no such curative measure available other than a mistrial.

Inadmissible Under Texas Rules

Of Evidence 403:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, or needless presentation of cumulative evidence. (Texas Rules of Evidence 403) When undertaking a Rule 403 analysis, must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted Gigliobianco v. State, 210 S.W. 3d 637 (Tex. Crim. App. 2006)

In relation to the first protocol for a 403 analysis under Gigliobianco, the Court must consider the inherent probative force of the proffered item of evidence. The presence of a second Sane kit was not connected with the sexual assault of Ms. Alaniz. Therefore, "the inherent probative force of the proffered item of evidence," is lacking given the evidence presented at trial and the theories of both the prosecution and defense. Once the jury was made aware of the second Sane kit, the only curative measure was to declare a mistrial.

The second prong under the Gigliobianco protocols is that the proponent's need for that evidence **be** considered. The State did not tie the presence of a second Sane kit to their theory of the case. The State did not tie the presence of a second Sane kit to their theory of the case. The State **addmitted** that the second kit was presented in error and was not admissible. The State does not need evidence of the Second Sane Kit to prove the theory of their case in any way. Once the jury was made aware of the second Sane kit, the only curative

measure was to declare a mistrial

The third prong under the Gigliobianco protocols is that the court should consider any tendency of the evidence to suggest decision on an improper basis. In the present case, the jury is made aware of the presence of a potential second sexual assault victim connected to the Appellant The jury then could surmise that along with being charged with the Sexual Assault of Ms. Alaniz, the Appellant had been implicated in another sexual assault. This factor could have made the jury hostile toward the Appellant, and lead them to align with the prosecution without considering the probative value of the evidence itself. "Evidence might be unfairly prejudicial if, for example, it arouses the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence." Cortina v. State, unpublished, No. 06-13-00084CR (Sixth Court of Appeals, Texarkana, December 11, 2013) While the evidence was never admitted, the jury was made aware of its existence. With the existence of a

second Sane kit present for the jury's consideration, one need only apply the "reasonable person" standard set forth in Montgomery, (810 S.W. 2d 372) to see that the jury would be compelled to make a decision on an improper basis. therefore, the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. People v. State, 974 S.W. 2d 892, (Tex. App.-Austin 1998, pet. ref'd) Under the third prong of Gigliobianco, the evidence was extremely prejudicial to the Appellant. Once the jury was made aware of its existence, the only curative measure was for the Court to declare a mistrial

The fourth prong set forth in the Gigliobianco protocols is that the court should consider any tendency of the evidence to confuse or distract the jury from the main issues. As discussed above, the existence of a Second Sane kit/sexual assault victim does not make any element of the charged crime any more or less likely to have occurred. With the neither a casual connection between

the evidence and the crime, nor a logical connection to either the prosecution's or defenses theory of the case, the evidence could only serve distract the jury from the main issues. Though it was not admitted, the fact that it was discussed by the State's expert in the jury's presence served to prejudice the jury against the Appellant. The only curative measure at that point was to declare a mistrial.

The fifth prong of the Gigliobianco protocols is that the court should consider any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence. The evidence in this matter was introduced through the testimony of the Detective. The Sane kit and all of the implications associated there with could not necessarily have been readily understood by lay people without the explanations of the experts and the admittance of a medical report. "Scientific" evidence might mislead a jury that is not properly equipped to judge the

probative force of evidence." Gayton v. State, 331 S.W. 3d 218 (Tex. App.-Austin 2011), see also Holte v. State, unpublished, (No. 01-12-00338-CR First court of Appeals, December 1, 2013) Therefore, the jury could have given the evidence undue weight because they were unequipped to evaluate the probative force of evidence, the mere existence of a possible second victim is not curable in that manner.

The sixth and final prong of the Gigliobianco protocols is that the court must determine the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. In the present case, the evidence was offered and discussed by State's detective and the State's medical expert. Under prong six of Gigliobianco, the evidence was correctly excluded. However, the fact that the jury was made aware of the existence of a second Sane kit was a defacto admission by the State that a second assault had occurred, and that the Appellant was somehow connected

thereto. The only curative measure at that point was for the court to grant a mistrial.

## Inadmissible Under Texas Rules of Evidence 401:

During the pendency of the guilt or innocense phase of a trial, The Court should only admit evidence that is relevant to the crime charged. Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. (TEXAS RULES OF EVIDENCE, 401) In deciding whether a particular piece of evidence is relevant, a trial court judge should ask "would a reasonable person, with some experience in the real world believe that the particular piece of evidence is helpful in determining the truth or falsity of any fact that is of consequence of the lawsuit" Montgomery v. State, 810 S.W. 2d 372, (Tex. Crim. App. 1990) In the present case, the existence of second Sane kit

does not make any element of the charged crime any more or less likely to have occurred. Further, its mere existence could only serve to persuade the jury of the Appellant's guilt based on something other than the evidence admitted at trial. With no logical connection to any fact issue in the cause of action, the evidence is therefore irrelevant under TRE 401. Evidence which is not relevant is inadmissible. (Texas Rules of Evidence 402) Though the court did not admit the evidence, it was testified to in the presence of the jury. The only curative measure was to declare a mistrial.

Issue 2: The Court abused its discretion by admitting evidence of the Appellant's prior convictions over defense objections siting Rule 602 and 902 of the Texas Rules of Evidence.

Inadmissible under **Texas** Rules of Evidence 602

Texas Rule of Evidence 602 provides that a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of

the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness; This rule is subject to the provisions of Rule 703, relating to opinion testimony by an expert witness.

During the sentencing portion of the present case, the State was allowed to admit documents alleging to substantiate the Appellant's prior convictions for burglary and crimes against nature out of the Common wealth of Virginia. However there was no witness presented who was present at the time the alleged convictions were handed down. No one with personal knowledge testified as required under the rule. Therefore, under Texas Rules of Evidence Rule 703, the records should not have been admitted, and the Court abused its discretion by allowing it.

Inadmissible Under Texas Rules of Evidence 902

Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

(1) Domestic Public Documents Under Seal. A document bearing a seal purporting to be that of the United States, or of any State, district, Commonwealth, territory, or insular possession thereof, or the Panama Canal Zone, or the Trust Territory of the Pacific Islands, or of a political subdivision, department, officer, or agency thereof, and a signature purporting to be an attestation or execution. In the present case, the documents bore no seal for the Commonwealth of Virginia. Further, the only signatures on the documents were those of Virginia Gunn, a notary public. The documents were not in adherence to Rule 902, and were therefore not admissible.

## Conclusion

Issue 1: The Court's denial of Defense request for a mistrial was in error. The second Sane kit being presented in open court was a breach of the Appellant's Due Process rights under the United States and Texas State Constitution. The evidence was not relevant to the crime charged and therefore was not admissible under Texas

Rules of Evidence 401; the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, therefore the evidence was properly excluded under Texas rules of Evidence 403, however the only curative measure available after the jury became aware of its existence was to declare a mistrial; The evidence was extraneous in nature, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. Therefore, the evidence was rightfully excluded. However, since it was shown and discussed in the presence of the jury, the only curative measure was to grant a mistrial.

Issue 2: The court abused it discretion by admitting evidence of the Appellant's prior convictions over defense objections siting Rule 602 and 902 of the Texas Rules of Evidence. The documents were not authenticated by a person with personal knowledge as required by Rule 602, nor were they in adherence to the rules out-

lined in Rule 902. They were therefore inadmissible.

## Prayer

Appellant prays that the Court of Appeals reverse and remand the conviction and release the Appellant as ordering a mistrial under the circumstances would violate the Appellant's constitutional rights against being prosecuted twice for the same offense, or in the alternative, order a new trial for the Appellant based upon the jury's knowledge of inadmissible and extremely prejudicial evidence. Finally, the Appellant prays that the Court of Appeals reverse and remand the sentence and order a new trial on sentencing for the Appellant based upon the admittance of the documents alleging to show prior convictions, but which did not adhere to the requirements under Rule(s) 602 and 902 of the Texas Rules of Evidence.


# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

ORLANDO ROBLES,                                                         Appellant,

v.

THE STATE OF TEXAS,                                                     Appellee.

### On appeal from the 28th District Court
### of Nueces County, Texas.

## MEMORANDUM OPINION

### Before Justices Rodriguez, Garza, and Longoria
### Memorandum Opinion by Justice Garza

A Nueces County jury convicted appellant, Orlando Robles, of sexual assault, a second-degree felony, and sentenced him to twenty years' imprisonment. *See* TEX. PENAL CODE ANN. § 22.011 (West, Westlaw through Ch. 46, 2015 R.S.). On appeal, he contends that the trial court erred: (1) by denying his motion for mistrial when the State introduced evidence of an unrelated sexual assault, and (2) by admitting evidence of prior

convictions at the punishment phase. We affirm.

## I. BACKGROUND

Robles was charged by indictment with having intentionally or knowingly penetrated the sexual organ of S.A.,[1] the complainant, with his finger and without the consent of the complainant. *See id.*

At trial, S.A., who was twenty years old at the time of her testimony, testified that she was driving her car in Corpus Christi at around 4:00 a.m. on or about September 29, 2013. She was going to Cole Park to meet a friend and "[j]ust to think, get my head clear." Because the friend did not respond to her texts, S.A. left the park and headed to her home. As a precaution, she checked to make sure no one was following her.

S.A. stated that, when she stopped at an intersection, a man walked up to the driver's side of her car and told her she was "dragging something." The man instructed her to pull over to the right, and she did. The man also pulled over to the right in his truck. The man exited the truck and touched the tire of S.A.'s car. At that point, sensing "something was off," S.A. got back in the car and retrieved her car keys. She then returned to the back of the car. According to S.A., the man asked "about like three times" where her spare tire was. S.A. stated she grabbed her keys around her hand and "h[e]ld them like if something was going to happen." S.A. stated that the man then attacked her, causing her to fall to the ground. S.A. begged the man to stop and told him to take the money that was in the car. S.A. testified the man "slam[med]" the side of her head against the ground, pulled her shorts off, and "stuck his fingers inside of [her]." She stated that

---

[1] Although the complainant's identity was not concealed at trial, we will use only her initials here, given the nature of the case. *See, e.g., Sledge v. State*, 953 S.W.2d 253, 258 n. 1 (Tex. Crim. App. 1997) (Overstreet, J., dissenting).

2

she was trying to fight back against the man and that she struck him repeatedly with her keys on the back of his neck. She pressed the panic button on her keys, which caused the car to start honking. After four honks, she ran to get inside her car and she "t[oo]k off." According to S.A., she initially attempted to "run him down" but she then got "real dizzy," and "he took off."

S.A. drove to a nearby Stripes store and called her boyfriend. When he did not answer, she called her mother. When her mother did not answer, she called her brother, and her brother came to the scene with her mother. S.A. did not call the police, but the police eventually arrived. S.A. was "scared, shook up, [and] angry" when answering questions posed by police. S.A., her brother, and her mother picked up one of S.A.'s friends and went home.

At the scene, S.A. could not give a description of the assailant. When she spoke to detectives the next day, S.A. was unable to identify her assailant from "two or three" photo lineups. At trial, she testified that the assailant was "Mexican, not built but stocky," and about 40 to 50 years old.

According to S.A., the police officer at the scene initially told her that an ambulance would come to take her to the hospital, but "after everything was done, he told me to go home and take a shower." S.A. did not think that was a good idea. She stated that she went home, smoked marihuana, and later went to the hospital because she "wanted to get checked out." She was later transported by ambulance to a different hospital for a sexual assault nurse examination ("SANE exam"). When S.A. gave a urine sample at the request of hospital staff, she noticed that she had been "nicked" inside her sexual organ, causing a small amount of bleeding. S.A. testified that the assailant also caused minor

3

injuries to her face, knees, hands, neck, and lips.

Police officer Alyssa Hernandez testified that she was on patrol on the date and time in question when she saw S.A. "waving me down" and crying in front of the Stripes store. S.A. "kept saying, 'He tried to rape me, he tried to rape me.'" S.A. had blood on her legs and looked "disorganized and disarrayed." Hernandez stated that S.A. was cooperative with police; however, when S.A.'s brother arrived, he "was so upset at the situation that I had to threaten him a couple of times, 'If you don't stop interfering, I'm going to arrest you for interference.'" Hernandez stated that she "understood where he was coming from because I would be upset too." Hernandez denied telling S.A. to go home and take a shower.

Officer Eric Smith testified that he was Hernandez's field training officer on the date and time in question. According to Smith, S.A. said "I stabbed him" multiple times. Smith testified that he allowed S.A. to go to the hospital with her family because "I didn't want to traumatize her more by taking her in an ambulance, or have us transport her." When the prosecutor asked whether he advised S.A. to go home and take a shower, Smith replied: "No, that's a huge don't, for the SANE Exam, there's several policies and we need them not to take a shower, not to wash, not to change clothes because we need that as evidence."

A DNA sample was obtained from S.A.'s car key. A forensic scientist testified that, "to a reasonable degree of scientific certainty," Robles or an identical twin was the source of the DNA on the car keys. DNA obtained from S.A.'s underwear was consistent with S.A.'s DNA profile. Another sample taken from S.A.'s underwear was consistent with a mixture, and neither S.A. nor Robles could be excluded as contributors. Robles was

excluded, however, as a contributor to a DNA sample obtained from S.A.'s vaginal swab taken as part of the SANE exam.

Nurse Carol McLaughlin testified that she performed S.A.'s SANE exam thirteen hours after the assault allegedly occurred. According to McLaughlin, the exam revealed "23 separate areas of injury" on S.A.'s body, including a one-centimeter "linear bruising abrasion" to the labia minora of her vagina that looked "pretty new." McLaughlin agreed with the prosecutor that the injury was consistent with the insertion of a finger "in a violent rough manner."

The jury found Robles guilty. At the punishment phase, the State presented the testimony of G.G., who stated that, in October 2013, Robles assaulted her by grabbing her breasts. The jury assessed punishment at the maximum twenty years' imprisonment, see id. § 12.33(a) (West, Westlaw through Ch. 46, 2015 R.S.), and this appeal followed.

## II. DISCUSSION

### A. Motion for Mistrial

By his first issue, Robles contends his constitutional right to due process was violated, and the trial court erred in denying his motion for mistrial, after evidence of an unrelated sexual assault offense was introduced into evidence.[2]

During trial, Detective Jason Smith identified a box that he had obtained from the evidence locker at the police station. Smith stated that the box contained evidence from a SANE exam. He denied that he packed the box, and he did not know what was inside the box apart from what was written on the outside. When the prosecutor asked what

---

[2] In the "issues presented" section of his brief, Robles includes another issue arguing that the State's "introduction and then removal" of the aforementioned evidence constituted a "de facto admission" of the evidence. However, Robles does not support this issue with argument or references to authority; accordingly, we do not address it. See TEX. R. APP. P. 38.1(i).

5

was written on the outside of the box, Smith replied: "It says 'sexual assault evidence collection kit' [and] without removing the paper I can see it says 'panties and kit.' I can't see the patient's name through that but you can see the evidence tape, I'm assuming the blue is from DPS, I'm not sure. I can see my initials up here 'JTS.'"

Later, the prosecutor asked nurse McLaughlin to identify the same box, designated as State's Exhibit 52. McLaughlin removed a piece of tape from the box and replied: "This is a sexual assault evidence kit that I collected on an [A.T.] on September 28, 2013." At that point, the prosecutor acknowledged that the box presented as State's Exhibit 52 was "the wrong kit" and "is from a different case [altogether]." Defense counsel moved for a mistrial, arguing: "The State offered evidence to the jury now it's extraneous evidence. It's extraneous offense, I mean, it doesn't take an Einstein on the jury to figure out, 'Well, you got more than one rape kit, you got more than one victim.'" Defense counsel elaborated, outside the presence of the jury, as follows:

> I don't think there's any question that there was testimony offered about [S.A.]'s test kit, and now [McLaughlin] has identified another test kit with another name. The jury knows what that test kit is about and what the purpose of it is, and I don't see how there could be any inference that it is not another case connected with this defendant. . . .

> And for the record, Your Honor, [A.T.] is another case which was very instrumental in getting my client arrested, she drew a comb positive [sic] drawing, she was examined, I don't know—I don't think there's an indictment on her but there's an offense reports [sic] on her. The two cases were submitted to DPS under one cause number—one case number. And I think [Detective] Smith had to go back and separate the two request forms because they said they wouldn't do an examination—multiple examinations on one case. But this is a case, Your Honor, that also took place on September 28, this was the day before and this is a situation where a lady on the Arts Apartments on Ocean Drive was supposedly attacked in the underground parking area early in 3 o'clock in the morning, 3:40 something in the morning.

The trial court denied the motion for mistrial, but gave the jury the following instruction:

6

"Apparently, that was the wrong box ladies and gentlemen. The Court is going to ask you to disregard the testimony of this prior witness at this point."

The following day, prior to closing arguments, defense counsel reiterated his objection outside the presence of the jury as follows:

> I want to renew my request for a mistrial on this case. I got calls last night until 10:30 about the fact that my client had two allegations against him. The press has been broadcasting since Tuesday the nature of this trial, yesterday, and this morning and in the newspaper also it [al]ludes to the fact that my client has two charges against him. I think it was unusual that the wrong rape kit or sexual assault kit got identified by Officer Smith or Detective Smith and also got identified by [McLaughlin], but she actually read the name of another person which she was asked. I don't really blame her, that's what she was asked to do but I think that the inference it's so overwhelming that my client has committed an extraneous offense and that's just a little bit more evidence that a jury will need to resolve the doubt in favor of the State, if they had even a close doubt, so I want to renew my objection and to the—my request for a mistrial.

The trial court ruled as follows:

> I think I've been admonishing the jurors not to hear, listen, read any news reports concerning this case and I can only hope that the jurors have followed the Court's instructions. And I believe there was no connection to the box to any other case the defendant may or may not have pending, so your objection is—your request for mistrial is denied.

A mistrial is an appropriate remedy only in "extreme circumstances" for a narrow class of highly prejudicial and incurable errors. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). A mistrial halts trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Id.* Whether an error requires a mistrial must be determined by the particular facts of the case. *Id.* A trial court's denial of a mistrial is reviewed for an abuse of discretion. *Id.* We view the evidence in the light most favorable to the trial court's ruling, considering only those arguments before the court at the time of the ruling. *Id.* The trial court's ruling must be upheld if it was within the zone of reasonable disagreement. *Id.*

7

We find no abuse of discretion in the trial court's denial of Robles's motion for mistrial. The unrelated SANE kit was undoubtedly irrelevant and inadmissible as evidence in Robles's trial. However, the jury was never made aware that the unrelated SANE kit involved Robles in any way. The only indication in the record that Robles was suspected in the unrelated sexual assault was defense counsel's representation outside the presence of the jury that the unrelated case "was very instrumental in getting my client arrested."

Even if the jury had been made aware that Robles was the alleged perpetrator of the assault evidenced by the unrelated SANE kit, the prosecutor immediately recognized the error and the trial court instructed the jury to disregard McLaughlin's testimony.

> It is well-settled that testimony referring to or implying extraneous offenses can be rendered harmless by an instruction to disregard by the trial judge, unless it appears the evidence was so clearly calculated to inflame the minds of the jury or is of such damning character as to suggest it would be impossible to remove the harmful impression from the jury's mind.

*Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992); *Stine v. State*, 300 S.W.3d 52, 58 (Tex. App.—Texarkana 2009, pet. ref'd); *Allen v. State*, 202 S.W.3d 364, 370 (Tex. App.—Fort Worth 2006, pet. ref'd). Here, even assuming the jury was somehow aware of Robles's identity as the suspect in the unrelated case, the reference to the other case was not so inflammatory as to undermine the efficacy of the trial court's instruction to disregard. *See Kemp*, 846 S.W.2d at 308 (finding that witness's statement that appellant "had recently been released from the penitentiary" was "uninvited and unembellished" and was cured by trial court's instruction to disregard); *Gardner v. State*, 730 S.W.2d 675, 696–97 (Tex. Crim. App. 1987) (holding the same where witness testified that appellant "told me that even when he was in the penitentiary, that he had stomach problems"); *see also Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005) ("On appeal, we

8

generally presume the jury follows the trial court's instructions in the manner presented.").

We overrule Robles's first issue.

## B. Evidence of Prior Convictions

By his second issue, Robles argues that the trial court erred in admitting evidence, at the punishment phase, of prior convictions. Robles contends that the evidence was inadmissible under rules 602 and 902 of the Texas Rules of Evidence. We review a trial court's ruling on the admissibility of evidence for abuse of discretion. *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006). We will not disturb the trial court's decision as long as the ruling was within the "zone of reasonable disagreement." *Id.*

Prior to the presentation of testimony at the punishment phase, the State sought to introduce its Exhibits 55 and 56, two documents purporting to show that Robles had previously been convicted of felonies in Virginia. Exhibit 55 states "Felony Burglary: At Night, to Commit Felony" with the date of offense listed as March 12, 2010. The exhibit also showed that Robles pleaded guilty to the offense and that a sentence of two years in the penitentiary was imposed, with the sentence suspended for one year and eleven months. Exhibit 56 states "Felony Crimes Against Nature" with the date of offense listed as March 28, 2005. The exhibit states that the charge was amended to "Indecent Exposure" but does not state how Robles pleaded. It appears that Robles was sentenced to twelve months' imprisonment, with the sentence suspended for twelve months. Both documents contain Robles's name, date of birth, and social security number, and both were certified as "complete, full, true, and exact reproduction[s] of the original document[s]" by a notary public. The trial court overruled defense counsel's objections and admitted both exhibits as evidence.

9

Texas Rule of Evidence 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." TEX. R. EVID. 602. Texas Rule of Evidence 902 states in relevant part that the following items of evidence are "self-authenticating" in that "they require no extrinsic evidence of authenticity in order to be admitted":

(1) *Domestic Public Documents That Are Sealed and Signed.* A document that bears:

    (A) a seal purporting to be that of the United States; any state, district, commonwealth, territory, or insular possession of the United States; the former Panama Canal Zone; the Trust Territory of the Pacific Islands; a political subdivision of any of these entities; or a department, agency, or officer of any entity named above; and

    (B) a signature purporting to be an execution or attestation.

. . . .

(8) *Acknowledged Documents.* A document accompanied by a certificate of acknowledgment that is lawfully executed by a notary public or another officer who is authorized to take acknowledgments.

TEX. R. EVID. 902.

On appeal, Robles contends that the evidence of his prior convictions was inadmissible under rule 602 because "there was no witness who testified to the authenticity of the documents"; and further, that the evidence was inadmissible under rule 902 because "the documents bore no seal [of] the Commonwealth of Virginia" and the only signature on the documents were those of a notary public. As the State correctly notes, however, Robles does not address section (8) of rule 902, which provides that documents certified and lawfully executed by a notary public are self-authenticating. *See* TEX. R. EVID. 902(8). We conclude that the evidence was admissible under this section of rule 902, and we overrule Robles's second issue.

10

### III. Conclusion

The trial court's judgment is affirmed.

DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
31st day of August, 2015.

11

Orlando Robles 01990845
Stiles Unit
3060 FM3514
Beaumont, Tx
7705

Court of Criminal Appeals
of Texas

P.D. Box 12308
Capitol Station, Austin, Tx.
78711